**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Michael L. Bond and Cherie Bond, husband and wife, | ) ) ) | No. CV-06-1249-PHX-DGC |
| Plaintiffs, | ) ) | |
| vs. | ) ) | **ORDER** |
| American Family Mutual Insurance Company, a Wisconsin corporation, et al., | ) ) ) ) | |
| Defendants. | ) ) ) | |

Defendant American Family Mutual Insurance Company has filed a motion for partial summary judgment. Dkt. #110. For the reasons set forth below, the Court will grant the motion in part and deny it in part.

**I.   Factual Background.**

Plaintiffs Michael and Cherie Bond insured their home under a policy issued by Defendant. *See* Dkt. #111 Ex. 1. The policy was effective from March 18, 2005, to March 18, 2006. *Id*. On March 31, 2005, a pipe burst in Plaintiffs' home, causing flooding and damage to the home's structure, particularly the ceiling. *See id*. ¶10.

**A.   Emergency Services.**

The same day, Mr. Bond contracted with Helping Hand Fire and Water Restoration ("Helping Hand") to remove and dry the contents of the home. *See id*. ¶12. Upon completion of its services, Helping Hand submitted invoices of $14,604.06 for dry-out of the home and $7,710.67 for removal of its contents. *See id*. ¶¶41, 43. Defendant offered to pay

1  $5,258.97 for the dry-out service and $7,710.67 for the removal service. *See id.* ¶¶42, 46.
2  The $5,258.97 amount was based on a comparative estimate furnished by an emergency
3  services contractor, Damage Control, LLC, and did not include general contractor's overhead
4  and profit. *See id.* ¶¶45, 47.

### B.    Actual Cash Value.

Defendant made an estimate of the needed repairs for the home, an amount referred to as the "actual cash value," and paid Plaintiffs $5,067.03 ($6,067.03 estimate less the policy's $1,000 deductible). *See id.* Ex. 8. Defendant subsequently provided Plaintiffs with an additional payment of $874.07 ($8,011.79 revised estimate less the $5,067.03 already paid, less $1,070.69 for depreciation, less the $1,000 deductible). *See id.* Ex. 19. Neither the initial nor revised estimates included contractor overhead and profit.

Public adjuster Michael Peterson was retained by Plaintiffs and estimated that they were owed $29,948.58 for needed repairs ($35,015.61 actual cash value, less the $5,067.03 initially paid by Defendant). *See id.* Ex. 14. The $35,015.61 figure reflected $23,322.55 for base service charges, 34% overhead, 6% profit, and 5.7% sales tax. *See id.* Ex. 14. It did not include a deduction for depreciation. *See* Dkt. #113 ¶95. Mr. Peterson later submitted a revised estimate of $43,084.03 for repairs to the home – $28,696.61 for base service charges, 34% overhead, 6% profit, and 5.7% sales tax. *See* Dkt. #111 Ex. 21.

### C.    Replacement of the Plumbing System.

To prevent the possibility of another leak, Plaintiffs had the home's plumbing system replaced. *See id.* Ex. 2 at 26. Ancillary damage caused from the replacement work was also repaired. *See id.* ¶31. Defendant denied that it was responsible for replacing the plumbing system or for the damage caused by the replacement. *See id.* ¶¶52, 54.

## II.    This Suit.

Plaintiffs allege breach of contract and bad faith tort claims. Dkt. #1. Plaintiffs contend that Defendant breached the insurance policy by failing to provide full payment for Helping Hand's emergency dry-out services, failing to pay for replacement of the plumbing system and related repairs, failing to submit full payment for the structural repairs, and

failing to include contractor overhead and profit and sales tax in the actual cash value payment. *Id*.

Defendant now moves for partial summary judgment, arguing that replacement of the plumbing system and the damage caused while replacing the system are not covered under the policy, that there is no evidence the repair costs exceeded the amounts provided by Defendant, and that contractor overhead and profit need not be considered in determining actual cash value.[1]  Dkt. #110.  Plaintiffs submitted a response and Defendant replied. Dkt. ##112, 118.[2]

## III. Discussion.

### A. Mrs. Bond's Standing.

Defendant asserts that Mrs. Bond is not a proper party to this suit because she "has never had an ownership interest" in the home and therefore does not possess an insurable interest in the property.  Under Arizona law, an "'[i]nsurable interest' . . . means any actual, lawful and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction or pecuniary damage or impairment." A.R.S. § 20-1105(B).  Defendant does not dispute that Mrs. Bond was a named insured under the policy and was married to Mr. Bond – in this community property state – at the time of the loss. *See* Dkt. #112.  Defendant has not carried its burden of demonstrating that Mrs. Bond has an insufficient economic interest in the home and therefore lacks an insurable interest.

### B. Replacement of the Plumbing System and Access Damage.

Defendant claims that it is not responsible under the insurance policy for replacing

---

[1] Plaintiffs devote several pages to the amounts paid for Helping Hand's emergency services, but those payments are not at issue in Defendant's motion. *See* Dkt. #118 at 5 ("American Family is not asking the Court to grant summary judgment as to . . . the Helping Hand emergency services bill.").

[2] Plaintiffs' counsel is reminded to comply with Local Rule of Civil Procedure 7.1(b)(1), which requires all pleadings and motions to be "in a fixed-pitch type size no smaller than ten (10) pitch (10 letters per inch) or in a proportional font size no smaller than 13 point, including footnotes."

1  Plaintiffs' plumbing system. Dkt. #110. Plaintiffs do not respond to this argument.

2  The policy provides that Defendant is not responsible for losses caused by "inherent
3  vice, latent or inherent defect, [or] mechanical breakdown," nor for "loss to the system or
4  appliance from which the water or steam escaped." Dkt. #110 at 6. Plaintiffs elected to
5  replace the plumbing system because they were concerned that leaks might recur. Dkt. #111-
6  3 at 26. This concern appears to have addressed a latent or inherent defect in the system,
7  which is not covered by the policy. The Court will grant summary judgment on Plaintiffs'
8  claims for the cost of replacing the plumbing system and the cost of repairs made necessary
9  by the replacement work.

10  **C.  Payments for Structural Repairs.**

11  The insurance policy provides that Defendant may settle a covered loss by paying "the
12  cost to repair the damaged portion or replace the damaged building, provided repairs to the
13  damaged portion or replacement of the damaged building are completed," or "the actual cash
14  value at the time of loss of the damaged portion of the building" if the building is not
15  repaired or replaced. Dkt. #111-2 at 4. The former settlement method is referred to as the
16  replacement cost value, the latter as the actual cash value.

17  Following the loss in this case, Defendant paid Plaintiffs an amount it deemed to be
18  the actual cash value of the loss. *See* Dkt. #111¶19; Dkt. #114 ¶19. The policy's
19  supplemental payment provision then enabled Plaintiffs, when they repaired the home, to
20  recover the difference between the repair costs and the actual cash value payment they had
21  received. *See* Dkt. #111-2 at 5. The parties agree that Plaintiffs repaired the home, but
22  Plaintiffs have provided no evidence that they availed themselves of the supplemental
23  payment provision or that the actual cost of their repairs exceeded the actual cash value paid
24  by Defendant. *See* Dkt. #110. Because Plaintiffs never sought supplemental payments under
25  the policy and have provided no evidence from which a trier of fact could find that they
26  incurred repair costs above the payment they received, Plaintiffs have failed to provide
27  evidence that could support a conclusion that they are entitled to a replacement cost value
28  in excess of the actual cash value Defendant paid. *See* Dkt. #113 Ex. 11 at p.15 (noting that

- 4 -

1 replacement cost value is not owed where an insured does not "actually incur more expenses
2 than were paid in the [actual cash value] settlement.").

3 Defendant provided Plaintiffs with $5,941.10 based on its determination of the actual
4 cash value ($5,067.03 initial estimate plus $874.07 from the revised estimate). *See* Dkt. #111
5 Exs. 8, 19. Plaintiffs' adjuster, Mr. Peterson, estimated the repair costs to be $29,948.58
6 ($35,015.61 actual cash value, less the $5,067.03 initially paid by Defendant). *See id.* Ex.
7 14. Plaintiffs claim that Defendant breached the policy by not paying the actual cash value
8 estimated by Mr. Peterson. The policy provides, however, that if Plaintiffs and Defendant
9 fail to agree on the amount of loss, either party may request an independent appraisal of the
10 loss. Dkt. #111-2 at 7. Plaintiffs did not challenge Defendant's loss determination under the
11 policy's appraisal provision. *See* Dkt. #111 ¶55; Dkt. #114 ¶55. Having failed to avail
12 themselves of the appraisal and supplemental payment provisions of the policy, and having
13 failed to produce any evidence that their repair costs exceeded Defendant's actual cash value
14 payment, Plaintiffs cannot now obtain additional funds by contending that the actual cash
15 value payment was too low. Permitting such a claim would allow an insured to game the
16 system by accepting an actual cash value payment, repairing the property for less than the
17 payment, and then seeking to recover more money by challenging the reasonableness of the
18 actual cash value payment in court without ever having invoked the policy provisions
19 designed to address inadequate actual cash value payments – the appraisal and supplemental
20 payment provisions. The Court will grant summary judgment on Plaintiffs' claim that the
21 Peterson estimate, rather than Defendant's estimate, should have been the amount of the
22 actual cash value payment. Plaintiffs had clear policy provisions that would have enabled
23 them to assert this position, but they chose to forego them.

24 Although Plaintiffs cannot make an end-run around the policy's appraisal and
25 supplemental payment provisions, the actual cash value payments must still have satisfied
26 the requirements of the law. Plaintiffs argue that the payments were deficient because they
27 did not account for general contractor overhead and profits. As noted above, Defendant's
28 policy is to pay for contractor overhead and profit only when such expenses are actually

- 5 -

1 incurred. *See* Dkt. #113 ¶104.

2 Actual cash value is defined in the policy as "the amount which it would cost to repair
3 or replace covered property with material of like kind, quality, less allowance for physical
4 deterioration and depreciation, including obsolescence." Dkt. #112 at 6. The definition
5 clearly contemplates what the repairs "would" cost at the time the payment is made, not what
6 they ultimately do cost. *See Lukes v. American Family Mut. Ins. Co.*, 455 F.Supp.2d 1010,
7 1015 n.2 (D. Ariz. 2006). A majority of courts addressing this issue have found that
8 contractor overhead and profit often are among the costs that would be incurred in repairing
9 covered losses. *See Mills v. Foremost Ins. Co.*, No. 06-16458, --- F.3d ----, 2008 WL 45806
10 (11th Cir. Jan. 4, 2008) (collecting cases). Defendant's policy does not exclude contractor
11 overhead and profit from the universe of expenses that may constitute part of the actual cash
12 value. *See Lukes*, 455 F.Supp.2d at 1015-16.

13 When the actual cash value payment was made by Defendant in this case, it was likely
14 that Plaintiffs would be required to pay for a general contractor's services. Defendant's own
15 estimate stated that several different contractors would be needed to perform repairs on
16 Plaintiffs' property – a carpenter, floor cleaning technician, drywall installer/finisher,
17 flooring installer, hardware installer, insulation installer, general laborer, plumber, painter,
18 and tile/cultured marble installer (*see* Dkt. #13 Ex. 18 at 13) – and the services of these
19 various contractors likely would require the oversight of a general contractor. In light of this
20 fact and the plain language of the policy requiring Defendant to pay the amount which it
21 "would cost" to repair the property, Defendant should have included contractor overhead and
22 profit in its actual cash value payments. *Tritschler v. Allstate Ins. Co.*, 144 P.3d 519, 529
23 (Ariz. App. 2006) ("if the cost to repair or replace . . . damaged property would likely require
24 the services of a general contractor, the contractor's overhead and profit fees should be
25 included in determining actual cash value, even when an insured ultimately elects to
26 complete personally the needed repairs.").

27 Defendant cites two cases to support its claim that actual cash value need not include
28 contractor overhead and profit: *Snellen v. State Farm Fire and Cas. Co.*, 675 F.Supp. 1064

(W. D. Ky. 1987), and *Clark v. Clarendon Ins. Co.*, 841 So.2d 1039 (La. Ct. App. 2003). These cases not only are contrary to *Tritschler* – the controlling authority in Arizona – they also are distinguishable from this case. In *Snellen*, the court held that contractor overhead and profit may be excluded from actual cash value because "the goal is to arrive at the actual cash value of the damage." *Snellen*, 675 F.Supp. at 1068. Actual cash value as defined in Plaintiffs' policy is not the "actual cash value of the damage," but the amount it would cost to repair or replace the damaged property. In *Clark*, the insurance policy did not define actual cash value. *Clark*, 841 So.2d at 1046. The court therefore turned to the dictionary and defined actual cash value "in terms of 'fair or reasonable cash price' and '[w]hat property is worth in money.'" *Id.* (quoting Black's Law Dictionary 53 (4th ed.1968)). The policy in this case does not define actual cash value as the value of the property, but as the amount it would cost to repair the property. As explained above, the repairs in this case would require the services of a general contractor, and the overhead and profit of such a contractor should therefore have been included in the actual cash value.

In sum, the Court concludes that Plaintiffs cannot make an end-run around the appraisal and supplemental payment provisions of the policy by asserting in this Court that Mr. Peterson's estimate of actual cash value was more reasonable than Defendant's. The Court will grant summary judgment against Plaintiffs on this issue. The Court also concludes, however, that Defendant's policy required it to include general contractor overhead and profit in the actual cash value payments it did make. The Court will deny Defendant's motion for summary judgment on this issue.

### D.     Bad Faith.

The tort of bad faith arises when an insurer "intentionally denies, fails to process or pay a claim without a reasonable basis." *Noble v. Nat'l Am. Life Ins. Co.*, 624 P.2d 866, 868 (Ariz. 1981). The tort will not lie for a claim that is "fairly debatable." *Id.* "The appropriate inquiry is whether there is sufficient evidence from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was

1  unreasonable." *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276, 280 (Ariz. 2000).

2  With respect to the emergency services, Plaintiffs have presented evidence that tends
3  to suggest that Defendant did not supply Damage Control with the insured's complete case
4  information and that Damage Control did not conduct a thorough investigation of the water
5  loss. *See e.g.*, Dkt. #113 ¶¶31, 52, 59, 61. From this evidence a jury could conclude that
6  Defendant acted unreasonably in adopting the estimate prepared by Damage Control. *See*
7  *Lerch v. Allstate Ins. Co.*, No. CIV 04-1924, 2006 WL 1789061, at *5 (D. Ariz. June 27,
8  2006). A jury could also infer from Defendant's alleged failure to give all pertinent
9  information to Damage Control that Defendant intentionally attempted to minimize Damage
10 Control's estimate as a means of avoiding significant payment to Plaintiffs. *See Bradshaw*
11 *v. State Farm Mut. Auto. Ins. Co.*, 758 P.2d 1313, 1325 (Ariz. 1988) (observing that intent
12 could be inferred from evidence that the insurer "sought its own legitimate objective –
13 settlement for as little as possible – by improper means[.]"). Whether Defendant possessed
14 such an intent and whether it should have relied on Damage Control's estimate are questions
15 for the jury. *See Zilisch*, 995 P.2d at 280.

16 Plaintiffs argue that Defendant's refusal to include contractor overhead and profit in
17 determining actual cash value also constitutes bad faith. Plaintiffs cite six cases in support
18 of this position (*see* Dkt. #112 at 12-13), but five of the cases do not even mention the words
19 "bad faith." The one case that does – *Ghoman v. New Hampshire Ins., Co.*, 159 F. Supp. 2d
20 928 (N.D. Tex. 2001) – merely rejected the defendant's argument that it had not breached
21 the policy and therefore was not liable for bad faith. *Id*. at 935-36. *Ghoman* says nothing
22 about the evidence needed for a bad faith claim to survive summary judgment

23 Plaintiffs also rely on *Tritschler* to support their argument. *Tritschler* did find
24 sufficient evidence to defeat summary judgment on the bad faith claim, but the evidence
25 consisted of specific information concerning the process by which the defendant refused to
26 pay overhead and profit in the case at hand, including the fact that the defendant refused to
27 seek a legal opinion even after its policy of not paying overhead and profit had been called
28 into question. 144 P.3d at 530-31. Plaintiffs have presented no comparable evidence

- 8 -

concerning the actions or intent of Defendant in this case. Plaintiffs' expert opines that it was common practice for insurers to pay overhead and profit, but this opinion is based on a statement about Allstate's policy in the *Tritschler* case and several class action lawsuits brought against companies other than Defendant. The opinion is not based on Defendant's knowledge or practices, nor upon its conduct in this case.[3]

In short, Plaintiffs have presented no evidence concerning the process by which Defendant chose in this case to withhold contractor overhead and profit. In the absence of evidence from which a jury could conclude that Defendant acted in bad faith in this case, the Court must grant summary judgment against Plaintiffs on this issue.

Finally, Plaintiffs contend that Defendant's failure to pay for the replacement of the plumbing system supports a finding of bad faith. As noted above, however, Plaintiffs have failed to present evidence supporting their claim that Defendant owed money for this replacement. The Court will grant summary judgment on this issue as well.

**E.     Impairment of Plaintiffs' Credit.**

Plaintiffs seek compensation for damage to their credit. Dkt. #1. This claim is based on Helping Hand's attempts to collect from Plaintiffs the full amounts owed for its emergency services and Defendant's refusal to fully indemnify Plaintiffs for those amounts. Plaintiffs have provided evidence that the Helping Hand collection effort affected their credit report and became an issue when they sought to refinance their home, resulting in a higher interest rate. *See* Dkt. #113 Ex. 4, pp. 56-58:22-14. Although the only evidence provided by Plaintiffs on this issue is Mr. Bond's somewhat equivocal testimony, the Court finds it sufficient to raise a question of fact that must be resolved by the jury.

---

[3]The expert refers to a deposition of Defendant's employee, John Gallegos, and asserts that it was not Defendant's policy to withhold overhead and profit from actual cash value payments before this case arose. *See* Dkt. #113, Ex. 17 at 2. But the expert provides no citation to the deposition. *Id*. The portions of the Gallegos deposition cited in Plaintiffs' statement of facts do not support this assertion. *See, e.g.*, Dkt. #113, Ex. 11 at 75-77.

- 9 -

### F. Punitive Damages.

"Punitive damages primarily further the same objectives underlying criminal law: punishing the defendant and deterring the defendant and others from future misconduct." *Gurule v. Ill. Mut. Life & Cas. Co.*, 734 P.2d 85, 86 (Ariz. 1987) (citing *Linthicum v. Nationwide Life Ins. Co.*, 723 P.2d 675, 679 (Ariz. 1986)); *see Haralson v. Fisher Surveying, Inc.*, 31 P.2d 114, 116 (Ariz. 2001); *Saucedo v. Sinaloa*, 24 P.3d 1274, 1277 ¶ 10 (Ariz. Ct. App. 2001). "Punishment is an appropriate objective in a civil case only if the defendant's conduct or motive 'involves some element of outrage similar to that usually found in a crime.'" *Gurule*, 734 P.2d at 86 (quoting *Rawlings v. Apodaca*, 726 P.2d 565, 578 (Ariz. 1986)). "Punitive damages are therefore 'undeserved as punishment' unless defendant acted with a knowing, culpable state of mind, or defendant's conduct was so egregious that the requisite mental state can be inferred." *Id.*

Something more than the commission of a tort is required before a defendant can be held liable for punitive damages. *See id.* at 87 (citing *Rawlings*, 726 P.2d at 578); *see Linthicum*, 723 P.2d at 680 ("We hold that before a jury may award punitive damages there must be evidence of an 'evil mind' and aggravated and outrageous conduct."); *Saucedo*, 24 P.3d at 1277 ¶ 11 ("To recover punitive damages, a plaintiff must prove something more than the underlying tort."). "The requisite 'something more,' or 'evil mind,' is established by [clear and convincing] evidence that defendant either (1) 'intended to injure plaintiff or (2) consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others.'" *Id.* (quoting *Rawlings*, 726 P.2d at 578); *see Linthicum*, 723 P.2d at 681 ("We hold that the burden of proof for punitive damages is by clear and convincing evidence."); *Thompson v. Better-Bilt Aluminum Prods. Co.*, 832 P.2d 203, 208-10 (Ariz. 1992) (requiring clear and convincing evidence).

"'The standard articulated in *Rawlings* requires more than 'reckless indifference.'" *Gurule*, 734 P.2d at 88 (citing *Filasky v. Preferred Risk Mut. Ins. Co.*, 734 P.2d 76, 84 n.3 (Ariz. 1987); *Linthicum*, 723 P.2d at 680); *see Rawlings*, 726 P.2d at 578 ("Indifference to facts or failure to investigate are sufficient to establish the tort of bad faith but may not rise

to the level required by the punitive damage rule."). "Although the element of a tortfeasor's intent may be inferred, a plaintiff must always prove 'outwardly aggravated, outrageous, malicious, or fraudulent conduct.'" *Saucedo*, 24 P.3d at 1277 ¶ 11 (citing *Linthicum*, 723 P.2d at 680).

Although the Court finds the evidence sufficient to preserve a claim for bad faith on the Helping Hand payment, Plaintiffs have not provided evidence from which the requisite evil mind could be inferred. As noted above, tortious conduct such as insurance bad faith is not enough to warrant punitive damages. Thus, although the evidence identified by Plaintiffs may be sufficient to support a tort claim, *see* PSOF ¶¶ 119-126, but the Court concludes that it does not support the "something more" required for punitive damages under Arizona law, much less by clear and convincing evidence. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 254-55 (1986) (clear and convincing evidence standard applies at summary judgment stage).

**IT IS ORDERED:**

1. Defendant's motion for partial summary judgment (Dkt. #110) is **granted in part and denied in part**. The motion is denied with respect to Mrs. Bond's standing, Plaintiffs' breach of contract claim regarding the exclusion of contractor overhead and profit from actual cash value, Plaintiffs' bad faith claim regarding payments for Helping Hand's emergency services, and Plaintiffs' claim for damage to their credit. The motion is granted in all other respects.

2. A final pre-trial conference will be scheduled by separate order.

DATED this 19th day of February, 2008.

*/s/ Daniel G. Campbell*
———————————————
David G. Campbell
United States District Judge